

ENTERED
11/13/2013

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **CASE NO: 12-38036** |
| **MARCELO D'AMICO** | § | **CHAPTER 7** |
| | § | |
| **Debtor(s).** | § | **DAVID R. JONES** |
| | § | |
| **NEVADA PROPERTY 1 LLC; dba COSMOPOLITAN OF LAS VEGAS** | § | |
| **Plaintiff(s),** | § | |
| **vs.** | § | **ADVERSARY NO. 13-03041** |
| **MARCO D'AMICO** | § | |
| **Defendant(s).** | § | |
| **DESERT PALACE INC. dba CAESARS PALACE LAS VEGAS** | § | |
| **Plaintiff(s),** | § | |
| **vs.** | § | **ADVERSARY NO. 13-03042** |
| **MARCO D'AMICO** | § | |
| **Defendant(s).** | § | |

## MEMORANDUM OPINION

Before the Court are two adversary complaints filed by Nevada Property 1 LLC d/b/a Cosmopolitan of Las Vegas ("Cosmopolitan") and Desert Palace Inc. d/b/a Caesars Palace Las Vegas ("Caesars") against the Debtor. Cosmopolitan and Caesars each seek to except their respective claims from the Debtor's discharge under 11 U.S.C. § 523(a)(2) and (a)(6). Both claims are based on unpaid casino lines of credit or "markers." At the request of the parties, the Court conducted a joint trial. The parties stipulated to the admission of all exhibits. Cosmopolitan and Caesars each offered the testimony of a corporate representative. The Debtor was not called as a witness.

After considering the evidence and arguments, the Court finds that (i) Cosmopolitan and Caesars each hold enforceable claims that may be excepted from discharge under 11 U.S.C. § 523; and (ii) Cosmopolitan and Caesars failed to meet the required burden of proof to except their respective claims from the Debtor's discharge. In entering judgment in favor of the Debtor, the Court makes the following findings of fact and conclusions of law.

## Background

### The Cosmopolitan Credit Line

On July 29, 2011, a casino representative for Cosmopolitan sent the Debtor a credit application [Exhibit 1]. The application provides, in part, the following representations and disclosures:

> I, the undersigned, hereby give Nevada Property 1, LLC dba The Cosmopolitan of Las Vegas and its affiliates ("CLV") authorization to obtain and verify my financial information (including but not limited to account balance information) from any source, obtain my financial and employment history, and exchange information with others about my financial and account experience with CLV. . . .
>
> As a condition to being granted marker signing privileges, I agree to sign credit instruments, also known as markers or checks ("Markers") (e.g., chips, cash or tokens) in the amount of the funds issued to me. Further, I authorize CLV to complete any of the following information on those markers: (1) name of payee, (2) a date, (3) name, account number and/or address of any of my banks and financial institutions, (4) electronic encoding of the above, and (5) as otherwise authorized by the law. The information inserted may be for any account from which I now or may in the future have the right to withdraw funds, regardless of whether that account now exists, and whether I provided the information on the account to CLV.
>
> I REPRESENT THAT AT THE TIME I SIGN ANY MARKER, I HAVE ON DEPOSIT IN ACCOUNTS ON WHICH I AM AN AUTHORIZED SIGNATORY FOR ALL PURPOSES, WITHOUT RESTRICTION, FUNDS SUFFICIENT TO PAY SUCH MARKER UPON DEMAND OR PRESENTMENT.
>
> . . .
>
> I agree that this application and all credit issued pursuant thereto will be governed, construed and interpreted pursuant to the laws of the State of Nevada and venue shall lie solely in that state.

[Exhibit 1].

The Debtor completed and signed the application on July 30, 2011 [Exhibit 2]. The application itself, however, is dated August 2, 2011 [Exhibit 2]. In the application, the Debtor requested a $75,000 credit line [Exhibit 2]. In support of the credit request, the Debtor listed two bank accounts at Amegy Bank ending in XXXX484 and XXXX492 [Exhibit 2]. Both accounts are corporate accounts styled in the name of Orcus Fire Protection, LLC ("Orcus") [Exhibits 14 and 23]. At trial, Mr. Wolfe (the Cosmopolitan representative) testified that Cosmopolitan knew that the accounts were corporate accounts and cared only that the Debtor was a "signatory" and "could make a loan" on the accounts. Mr. Wolfe further testified that Cosmopolitan obtains this information from a third-party service provider.

On May 3, 2012, Cosmopolitan increased the Debtor's credit line from $250,000[1] to $500,000 [Exhibit 3]. On May 16, 2012, the Debtor's credit line was increased from $500,000 to $625,000. Mr. Wolfe testified that Cosmopolitan performed no background investigation for this increase. In addition to the $625,000 credit line, the Debtor deposited $500,000 in chips with Cosmopolitan thereby increasing his total credit limit to $1,125,000. To evidence his credit obligation, the Debtor executed a marker in favor of the Cosmopolitan for $1,175,000 [Exhibit 6]. Neither party offered an explanation for the difference in the amounts. The parties do agree that the Debtor failed to satisfy the marker and that Cosmopolitan presented the marker for payment at Amegy Bank on or about June 22, 2012 [Exhibit 6]. The marker was returned unpaid [Exhibit 6]. On July 11, 2012, Cosmopolitan issued a letter to the Debtor stating that it intended to have the Debtor criminally prosecuted under Nevada law unless the sum of $625,000 was paid on or before July 21, 2012 [Exhibit 5].[2] The parties agree that $625,000 remains unpaid.

**<u>The Caesars' Line</u>**

On or about May 8, 2012, the Debtor submitted a credit application to Caesars seeking a credit line of $500,000 [Exhibit 7]. In support of the application, the Debtor listed the two Orcus accounts at Amegy Bank ending in XXXX484 and XXXX492 [Exhibit 2].

The Caesars' application provides, in part, the following representations and disclosures[3]:

> Before drawing on my line of credit, if granted, I agree to sign credit instruments (i.e. checks) in the amount of the draw. I authorize ______ to complete any of the following items on these credit. Instruments: (1) the name of the payee, (2) any missing amounts, (3) a date, (4) the name, account number, and/or address and branch of any bank of financial institution, and (5) any electronic encoding of the above items. This information can be for any account from which I now have or may in the future have a right to withdraw funds, regardless of whether the account now exists, or whether I provided the information on the account to

[1] The testimony by Mr. Wolfe was unclear as to how and when the credit line increased from $75,000 to $250,000.

[2] The Court asked a number of questions of Mr. Wolfe regarding the propriety of submitting a demand for $1,175,000 to the Debtor's bank when Cosmopolitan knew that (i) it was holding a $500,000 deposit; and (ii) the total debt was $1,125,000. Mr. Wolfe failed to provide any legitimate responses to the Court's questions.

[3] The exact language of the application has been repeated complete with all grammatical errors.

> ______.
>
> . . .
>
> I agree that this application and all credit issued pursuant thereto will be governed, construed and interpreted pursuant to the laws of the State of Nevada and venue shall lie solely in that state.

[Exhibit 7].

Caesar's approved the Debtor for a $500,000 credit line on May 9, 2012 [Exhibit 9]. Mr. Gormley (the Caesars' representative) testified that the balances in the bank accounts that the Debtor listed in the application covered the credit line. On May 17, 2012, the Debtor executed two markers each in the amount of $250,000 [Exhibit 10]. On May 23, 2012, Caesars issued a statement to the Debtor requesting payment of the $500,000 on or before July 16, 2012 [Exhibit 10]. For reasons not fully explained, Caesar's presented the markers to Amegy Bank for payment on or about June 25, 2013 [Exhibit 13]. The markers were returned unpaid on or about July 10, 2012.

On July 17, 2012, Caesar's issued a letter to the Debtor reflecting that the two markers had been presented to Amegy Bank for payment and returned unpaid [Exhibit 11]. The letter further states that Caesar's intended to have the Debtor criminally prosecuted under Nevada law unless the sum of $500,000 was paid on or before July 27, 2012 [Exhibit 11]. The parties agree that $500,000 remains unpaid.

**The Amegy Accounts**

In support of his request for credit from both Cosmopolitan and Caesars, the Debtor listed two corporate bank accounts at Amegy Bank ending in XXXX484 and XXXX492. Both accounts were styled in the name of Orcus. The Debtor is Orcus' president.

Account No. XXXX484 had the following balances on the below specified dates:

| Date | Balance | Date | Balance |
|---|---|---|---|
| 04/02/12 | $680,373.51 | 06/04/12 | $216,840.63 |
| 04/04/12 | $662,271.04 | 06/07/12 | $116,840.63 |
| 04/05/12 | $718,115.81 | 06/08/12 | $18,734.02 |
| 04/06/12 | $688,115.81 | 06/19/12 | $44,910.02 |
| 04/11/12 | $518,115.81 | 06/25/12 | $-1,125,253.15 |
| 04/13/12 | $367,206.81 | 06/26/12 | $49,711.85 |
| 04/17/12 | $336,686.81 | 06/27/12 | $-450,288.15 |
| 05/02/12 | $216,686.81 | 06/28/12 | 49,641.85 |
| 05/03/12 | $197,631.49 | 07/02/12 | $-1,144,575.71 |
| 05/07/12 | $189,119.29 | 07/03/12 | $30,389.29 |
| 05/09/12 | $309,119.29 | 07/05/12 | $-477,717.32 |
| 05/10/12 | $335,295.29 | 07/05/12 | $22,212.68 |

| Date | Balance | Date | Balance |
|---|---|---|---|
| 05/18/12 | $424,982.20 | 07/09/12 | $22,205.77 |
| 05/25/12 | $224,971.20 | 07/26/12 | $56,734.52 |
| 05/31/12 | $261,080.20 | 07/31/12 | $56,726.52 |

[Exhibits 23, 24, 25 and 26]. Likewise, Account No. XXXX492 had the following balances on the below specified dates:

| Date | Balance | Date | Balance[4] |
|---|---|---|---|
| 04/02/12 | $27,355.78 | 06/04/12 | $46,994.23 |
| 04/06/12 | $57,355.78 | 06/06/12 | $41,494.23 |
| 04/09/12 | $61,095.78 | 06/07/12 | $141,494.23 |
| 04/11/12 | $239,095.78 | 06/08/12 | $51,494.23 |
| 04/12/12 | $227,652.43 | 06/11/12 | $36,494.23 |
| 04/13/12 | $213,652.43 | 06/21/12 | $36,384.76 |
| 04/16/12 | $206,497.98 | 06/28/12 | $24,666.01 |
| 04/18/12 | $208,367.76 | 07/02/12 | $23,046.23 |
| 04/19/12 | $38,367.76 | 07/19/12 | $16,550.72 |
| 04/24/12 | $49,232.99 | 07/31/12 | $34,750.12 |

[Exhibits 14, 15 and 16].

Although not referenced in either credit application, the parties introduced statements at trial for two Amegy accounts titled solely in the Debtor's name (Account Nos. XXXX653 and XXXX060). The statements covered the period from March 2012 through July 2012. Account No. XXXX653 had the following balances on the below specified dates:

| Date | Balance | Date | Balance |
|---|---|---|---|
| 04/02/12 | $57,990.86 | 06/11/12 | -$600,118.51 |
| 04/03/12 | $57,717.86 | 06/12/12 | $99,622.12 |
| 04/04/12 | $55,931.12 | 06/15/12 | $99,317.37 |
| 04/05/12 | $74,032.05 | 06/18/12 | $98,615.34 |
| 04/09/12 | $73,807.05 | 06/19/12 | $98,476.67 |
| 04/10/12 | $73,550.71 | 06/22/12 | $96,486.84 |
| 04/11/12 | $73,388.28 | 06/26/12 | $96,431.84 |
| 04/13/12 | $73,264.51 | 06/29/12 | $97,469.84 |
| 04/16/12 | $71,234.78 | 07/03/12 | $116,685.86 |
| 04/18/12 | $71,096.11 | 07/05/12 | $116,156.43 |
| 04/23/12 | $71,032.36 | 07/06/12 | $115,206.01 |
| 04/24/12 | $70,977.36 | 07/09/12 | $114,859.84 |
| 04/30/12 | $68,582.86 | 07/11/12 | $114,753.46 |
| 05/01/12 | $66,927.77 | 07/12/12 | $114,617.46 |
| 05/02/12 | $65,940.47 | 07/13/12 | $114,328.49 |

4 At trial, Cosmopolitan and Caesars offered only certain monthly statements for Account #XXXX492. Statements for relevant time periods were not offered. The Court has used the daily balances contained in the statements that were offered into evidence.

| Date | Balance | Date | Balance |
|---|---|---|---|
| 05/04/12 | $84,703.56 | 07/16/12 | $110,960.11 |
| 05/11/12 | $84,429.18 | 07/18/12 | $110,821.44 |
| 05/16/12 | $83,648.38 | 07/20/12 | $110,688.40 |
| 05/18/12 | $83,509.71 | 07/23/12 | $109,997.40 |
| 05/24/12 | $83,454.71 | 07/24/12 | $109,942.40 |
| 05/31/12 | $82,942.57 | 07/25/12 | $107,442.40 |
| 06/01/12 | $81,751.88 | 07/26/12 | $106,922.52 |
| 06/04/12 | $80,665.46 | 07/27/12 | $104,932.69 |
| 06/05/12 | $99,881.49 | 07/31/12 | $105,572.66 |

[Exhibits 17, 18, 19, 20 and 21]. Throughout this time period, Account No. XXXX060 had a balance of approximately $7,700 [Exhibits 17, 18, 19, 20 and 21]. No evidence was adduced regarding the Debtor's other assets, if any, or the assets and operations of Orcus.

## Course of the Proceedings

The Debtor filed a voluntary chapter 7 case on November 1, 2012 [Docket No. 1, Case No. 12-38036]. The meeting of creditors occurred on November 27, 2012. The deadline to file a complaint seeking to except a claim from the Debtor's discharge was January 26, 2013[5] [Docket No. 7, Case No. 12-38036].

On January 25, 2013, Caesars filed a motion to extend the deadline to determine the dischargeability of its claim [Docket Nos. 27 and 28, Case No. 12-38036]. The Court extended the deadline to February 28, 2013 by Order dated January 28, 2013 [Docket No. 30, Case No. 12-38036].

On January 28, 2013, Cosmopolitan filed a motion to extend the deadline to determine the dischargeability of its claim [Docket Nos. 29, Case No. 12-38036]. The Court likewise extended the deadline to February 28, 2013 by Order dated January 28, 2013 [Docket No. 31, Case No. 12-38036].

On February 27, 2013, Cosmopolitan filed its complaint against the Debtor (Docket No. 1, Adv. No. 13-3041) seeking a determination that its debt is nondischargeable under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(6). The complaint was amended on April 22, 2013 (Docket No. 14, Adv. No. 13-3041). The Debtor filed its motion to dismiss and amended answer on May 1, 2013 (Docket No. 15, Adv. No. 13-3041). In its responsive pleading, the Debtor denied that Cosmopolitan was entitled to any relief and asserted that Cosmopolitan's debt was unenforceable under Texas law.

On February 27, 2013, Caesars filed its complaint against the Debtor (Docket No. 1, Adv. No. 13-3042) seeking a determination that its debt is nondischargeable under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(6). The Debtor filed its answer on March 20, 2013 (Docket No. 8,

[5] January 26, 2013 fell on a Saturday. Pursuant to FED. R. BANKR. P. 9006(a), the deadline was therefore extended to Monday, January 28, 2013.

Adv. No. 13-3042). In its answer, the Debtor denied that Caesars was entitled to any relief and asserted that Caesars' debt was unenforceable under Texas law.

On October 15, 2013, the Court conducted a joint trial at the request of the parties. The parties stipulated to the admission of 43 exhibits. Cosmopolitan and Caesars each offered a single witness that provided testimony about the underlying claims. The Debtor called no witnesses and, at the conclusion of Cosmopolitan's and Caesars' case-in-chief, moved for judgment on partial findings under FED. R. CIV. P. 52(c) as made applicable to this adversary proceeding by Bankruptcy Rule 7052. The motion was denied for the reasons stated on the record.

## Analysis

As a threshold issue, the Court must address the Debtor's assertion that the claims asserted by Cosmopolitan and Caesars are unenforceable under Texas law. The parties agree that if Cosmopolitan and Caesars do not hold enforceable claims, there is nothing to except from the Debtor's discharge.

The long standing rule in Texas is that "[p]atrons of gambling establishments occasionally borrow money from the proprietor or secure cash or chips from him by giving a check or other instrument, so as to take part in the game. It has been recognized that under such circumstances the proprietor (who is regarded as a participant in the game) cannot recover from the borrower on the loan or because the check or other instrument has been dishonored." *Gulf Collateral, Inc. v. Johnston*, 496 S.W.2d 123, 124 (Tex. Civ. App.—Waco 1973, writ ref'd n.r.e); *see also Carnival Leisure Indus., Ltd. v. Aubin*, 938 F.2d 624, 625-26 (5th Cir. 1991). Put simply, you can't enforce a gambling debt in Texas.

In each credit application, the Debtor agreed that Nevada law would apply. The parties' right to choose, however, that a particular transaction will be governed by the law of a particular state is not unlimited. Parties to a transaction may not agree that the law of one state will apply to a transaction if application of that law would violate the public policy of a competing state. *Addison v. Langston (In re Cotton Marketing, Inc.)*, 737 F.2d 1338, 1341 (5th Cir. 1984). Moreover, even if valid, this Court is not bound by any particular state's choice of law rules. *In re Christ*, 632 F.2d. 1226, 1229 (5th Cir. 1980). In resolving a federal question that requires reference to state law, the court should make an informed judgment that results in "the balancing of all the interests of the states with the most significant contacts in order best to accommodate the equities among the parties to the policies of those states." *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 162 (1946).

In this case, the Debtor went to Nevada to gamble and signed the markers in Nevada. On the otherhand, Cosmopolitan and Caesars attempted to enforce the debt against the Debtor's bank accounts in Texas. The Court finds that the enforcement of the debt is the central focus of the transactions between the parties. In light of the strong Texas public policy regarding the enforceability of gambling debts, the Court finds that Texas choice of law principals should apply. The Court must therefore next determine whether Texas or Nevada substantive law applies to this case.

In general, Texas law provides that a contractual choice of law provision should be given deference in situations where a conflict of law arises. *DeSantis v. Wakenhut Corp.*, 793 S.W.2d 670, 677 (Tex. 1990). That general proposition is limited by the notion that parties may not thwart the fundamental policy of a state that has a materially greater interest that the chosen state with respect to the particular issue and which would be the applicable state law absent an effective choice of law provision. *Id*. See also RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2). The Court is aware of the decisions rendered in this district in *In re Guevara*, 409 B.R. 442 (Bankr. S.D. Tex. 2009) and *In re Tarkbaf*, 2010 WL 148412 (Bankr. S.D. Tex. Jan. 12, 2010). Each of those decisions is carefully reasoned and rely upon an interpretation of the Fifth Circuit's decision in *Carnival Leisure Indus., Ltd. v. Aubin*, 938 F.2d 624 (5th Cir. 1991) and *Carnival Leisure Indus., Ltd. v. Aubin*, 53 F.3d 716 (5th Cir. 1995). This Court respectfully disagrees with the conclusions reached by the bankruptcy court in those decisions. The Court is more persuaded by the analysis set forth by Judge Gilmore in an unpublished decision rendered in *PNK v. Cypresswood Land Partners, I, et al*., Civil Action No. 10-CV-224 (S.D. Tex. September 22, 2010).

Texas law and the underlying public policies focus on transactions within the borders of Texas. *Castilleja v. Camero*, 414 S.W.2d 424, 427 (Tex. 1967). When the laws and policies of another sovereign are involved, a federal court sitting in Texas may enforce transactions governed by the law of that sovereign even though Texas law prohibits such transactions. *Id.* Accordingly, this Court may enforce a debt governed by Nevada law without offending Texas public policy. Applying the above, the Court finds that the impact on Nevada of the non-enforcement of gambling debts incurred within its borders is far more severe that the enforcement of a gambling debt against a Texas citizen that purposely availed himself of the opportunity to engage in gambling within Nevada's borders. The Court therefore concludes that the claims asserted by the Cosmopolitan and Caesars are valid and enforceable under the facts presented.[6]

Such a result finds support in notions of common sense and equity. Today's world is a much smaller place. Interstate travel and internet commerce are a routine part of everyday life. The law must be viewed with an eye toward our evolving society. It would work a severe injustice to allow an unsuccessful weekend jaunt to Vegas only to return to Texas on Monday morning, free of the consequences of one's voluntary, although perhaps unwise, entertainment decisions. Having determined that Cosmopolitan and Caesars hold claims that may be excepted from the Debtor's discharge, the Court will examine each of the claims asserted against the Debtor under 11 U.S.C. § 523.

**Dischargeability**

A party seeking to have its debt excepted from discharge must prove by a preponderance of the evidence that the debt is not dischargeable." *Raspanti v. Keaty (In re Keaty)*, 397 F.3d 264, 270 (5th Cir. 2005). The exceptions to discharge contained in § 523(a) are to be narrowly construed in the debtor's favor. *In re Miller*, 156 F.3d 598, 602 (5th Cir. 1998).

[6] The Court's determination does not consider any other personal defenses the Debtor may have to the claims asserted by Cosmopolitan and Caesars.

**<u>Dischargeability under 11 U.S.C. 523(a)(6)</u>**

Section 523(a)(6) of the Bankruptcy Code excepts from discharge any debt for the willful and malicious injury by the debtor to another entity or to property of another entity. *Raspanti v. Keaty (In re Keaty)*, 397 F.3d 264, 269 (5th Cir. 2005). An injury is "willful and malicious" where there is either an objective substantial certainty of harm or a subjective motive to cause harm. *Id.* at 270; *Williams v. IBEW Local 520* (*In re Williams*), 337 F.3d 504, 509 (5th Cir. 2003). The Fifth Circuit has instructed that for a debt to be nondischargeable under § 523(a)(6), a debtor must have acted with "objective substantial certainty or subjective motive" to inflict injury. *Miller v. J.D. Abrams, Inc. (In re Miller)*, 156 F.3d 598, 603 (5th Cir. 1998).

At trial, neither Cosmopolitan nor Caesars offered any competent evidence or advanced any legitimate theory to a finding under § 523(a)(6). In their post-trial briefs, Cosmopolitan and Caesars assert that "circumstantial evidence, consisting of the transactions within and balances of D'Amico's checking accounts, coupled with his course of obtaining large initial credit lines and increasing them, at other casinos during the time period in question, permits a conclusion that D'Amico made his false representations under circumstances that created an objectively substantial certainty of harm to [Cosmopolitan] [Caesars]." This argument belies the record. Both Cosmopolitan and Caesars adduced testimony that they rely on third party data services to provide the information they use to make their credit decisions and that the balances in the Orcus accounts combined with the deposits provided amble coverage for the extended credit. In failing to call the Debtor as a witness, the record is devoid of any possible inference of the Debtor's intentions or actions. The record further creates questions regarding the legitimacy of the demands for payment made by Cosmopolitan and Caesars upon the Debtor. While the business practices of Cosmopolitan and Caesars could be legitimately questioned, the issue before the Court is whether the Debtor caused a willful and malicious injury. The record presented to the Court contains no legal or factual basis for such a finding. The Court must therefore find that both Cosmopolitan and Caesars failed to meet their burden of proof under 11 U.S.C. § 523(a)(6). The Court will enter judgment in favor of the Debtor on the claims asserted under 11 U.S.C. § 523(a)(6).

**<u>Dischargeability under 11 U.S.C. 523(a)(2)(A)</u>**

Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge "any debt for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). In order to prevail, Cosmopolitan and Caesars must establish that (1) the debtor made the representations; (2) at the time the representations were made the debtor knew they were false; (3) the debtor made the representations with the intention and purpose to deceive the creditor; (4) the creditor relied on the representation; (5) the creditor sustained losses as a proximate result of the representations. *In re Bercier*, 934 F.2d. 689, 692 (5th Cir. 1991).

Again, at trial, neither Cosmopolitan nor Caesars offered any competent evidence or advanced any legitimate theory to a finding under § 523(a)(2)(A). Cosmopolitan and Caesars

assert in their post-trial briefs that the Debtor made a false representation "in his credit application and the marker returned Unpaid NSF, contrary to his representation that he had funds on hand sufficient to pay the marker." The Court will address each of these assertions.

The Cosmopolitan application states as follows:

> I REPRESENT THAT AT THE TIME I SIGN ANY MARKER, I HAVE ON DEPOSIT IN ACCOUNTS ON WHICH I AM AN AUTHORIZED SIGNATORY FOR ALL PURPOSES, WITHOUT RESTRICTION, FUNDS SUFFICIENT TO PAY SUCH MARKER UPON DEMAND OR PRESENTMENT.

Accordingly, the Debtor's representation is that if he signs a marker in the future, he will have sufficient funds on deposit in all accounts for which he is an authorized signatory to pay the marker. The credit application was signed on or about July 30, 2011. Mr. Wolfe's testimony was that a representative of Cosmopolitan filled in the Debtor's marker with the date of June 22, 2012. Cosmopolitan failed to provide any evidence regarding when this act was done. Likewise, the record is unclear as to when the Debtor actually executed the marker. Moreover, the copy of the marker submitted to the Court is illegible and no testimony was adduced regarding the specific language of the marker. Cosmopolitan provided no legitimate evidence that would suggest the representation in the application was false.

Interestingly and despite Caesars' representation to the contrary, the Caesars' credit application does not contain any representation by the Debtor regarding having sufficient funds on deposit to pay any marker. [Exhibit 7]. Likewise, the markers executed by the Debtor in favor of Caesars do not contain any such representation [Exhibit 13]. Caesars failed to provide any other supporting evidence. The Court finds Caesar's argument unpersuasive and lacking in good faith. Cosmopolitan and Caesars have each failed to satisfy element (1).

With respect to elements (2) and (3), Cosmopolitan and Caesars assert that sufficient unidentified circumstantial evidence exists on which the Court could find that the Debtor knew that his representations were false and that he intended to deceive them. Cosmopolitan and Caesars point the Court to no exhibit or testimony on which they rely to make this argument. The Court is not required to nor should it construct a party's case. All parties were advised that if an exhibit was not referenced by a witness and it contained statements that supported a particular proposition, counsel should bring such provisions to the Court's attention. The Court was directed to no such provisions. Moreover, Cosmopolitan and Caesars could have easily called the Debtor as a witness. Having chosen not to call the Debtor, the record is wholly devoid of the Debtor's thoughts, actions and intentions. Cosmopolitan and Caesars have each failed to satisfy elements (2) and (3).

Caesars and Cosmopolitan assert that the reliance element is satisfied based on the evidence of their respective background checks of the Debtor and their history of dealing. Neither Caesars nor Cosmopolitan offered any evidence of their past dealings with the Debtor. The argument that background checks satisfy the reliance requirement is unavailing. The

creditor's reliance must be upon the debtor's representation—not the report of a third party investigative service. Cosmopolitan and Caesars have each failed to satisfy element (4).

The Court finds that Cosmopolitan and Caesars have established that they suffered a loss. However, Cosmopolitan and Caesars both failed to establish that their respective losses were incurred as a result of any false or misleading representation. The Court therefore must find that both Cosmopolitan and Caesars failed to meet their burden of proof under 11 U.S.C. § 523(a)(2)(A). The Court will enter judgment in favor of the Debtor on the claims asserted under 11 U.S.C. § 523(a)(2)(A).

## Conclusion

Cosmopolitan and Caesars have failed to meet their respective burdens of proof on their claims of nondischargeability under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(6). The Debtor's obligations to Nevada Property 1 LLC d/b/a Cosmopolitan of Las Vegas and Desert Palace Inc. d/b/a Caesars Palace Las Vegas are discharged. A separate judgment consistent with the foregoing will issue.

**SIGNED: November 13, 2013.**

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**